UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                    BKY No. 14-60024

Roger A. Dahl and
Geraldine H. Dahl,                                        Chapter 7

      Debtors.

---

MEMORANDUM DECISION AND ORDER

---

At Fergus Falls, Minnesota, January 8, 2016.

The matter pending before the Court arises from the verified motion of Roger and Geraldine Dahl ("the Debtors" or "the Dahls") to reconvert their case to one under chapter 13. After holding a preliminary hearing on June 24, 2015, the Court scheduled an evidentiary hearing on the issue of whether the Debtors should be allowed to reconvert their case to one under chapter 13. The evidentiary hearing was held on September 30, 2015. Kevin T. Duffy appeared on behalf of the Debtors; Gene W. Doeling appeared in his capacity as the chapter 7 trustee; and Michael A. Loesevitz appeared on behalf of Ultima Bank Minnesota ("the Bank"). The only witness who testified was the co-debtor, Geraldine Dahl ("Geraldine"). The parties filed a "Stipulation for Evidentiary Hearing" in which they stipulated to undisputed facts, as well as to the admissibility of joint exhibits, all of which were received into evidence.[1] At the conclusion

---

[1] See ECF No. 122. A word of explanation is in order regarding the "Stipulated Exhibits." The exhibits are numbered consecutively from 1 through 17. There is some overlap and even duplication. The "Stipulated Exhibits" will be referred to as "Stip. Ex." followed by the exhibit number; however, they might also be referred to as "Bank's Ex. or Debtors' Ex." Every effort will be made to properly identify the exhibit(s) referred to herein. Further note: Stip. Ex. No. 17, "Letter from Midwest Bank," was to have been provided by counsel for the Debtors; it never was. Accordingly, it is not part of the record.

1

of the hearing, the Court requested post-trial briefs. All briefing has been concluded and the matter is now ready for resolution.

This is a core proceeding under 28 U.S.C. § 157(b)(2), and this Court has jurisdiction under 28 U.S.C. §§ 157(a) and 1334. The Court makes this memorandum decision based on all the files, records, and proceedings herein, and pursuant to Fed. R. Bank. P. 7052, made applicable to this contested matter by Fed. R. Bankr. P. 9014(c). For the reasons set forth below, the Debtors' request to reconvert their case back to one under chapter 13 will be denied.

## BACKGROUND

This case began in January 2014 as a chapter 13 reorganization. After the Debtors confirmed a modified plan on May 27, 2014, they struggled mightily to fulfill its terms. As part of the plan's requirements, the Debtors were required to sell their homestead in Mentor, Minnesota, and to use the net proceeds from that sale to pay off the Bank. They failed to do so.[2] They also committed to selling another property, the "Farmstead," in Winger, Minnesota. This property is also mortgaged to the Bank.[3] The Debtors were also unsuccessful in selling the Farmstead.[4] After the Bank sold the former homestead property, the Dahls moved into the Farmstead;[5] their daughter, son-in-law, and granddaughter also live there. Before moving in,

---

[2] The Bank was granted relief from the automatic stay and this property was foreclosed upon. See ECF No. 122, ¶ 9.

[3] The amount due and owing at the time of filing of the petition was $47,164.62. The Debtors were in default at the time. See ECF No. 122, ¶ 6.

[4] The Farmstead had previously been sold on a contract for deed to the Debtors' niece.

[5] After the case was converted, the Debtors claimed this property as their exempt homestead. The trustee objected. At the hearing, the Debtors conceded they could not legally exempt the Farmstead.

however, the Debtors had to evict their niece from the premises, which were left in a serious state of disrepair. Although Geraldine testified that the property is now habitable, she admitted that the residence was in need of several repairs – a "still to do" list if you will.[6] See Stip. Ex. No. 1, at 30, also marked as Bank's Ex. B.

The Debtors proposed a postconfirmation modified plan. The Bank filed a motion to dismiss the case. Those matters were heard on March 31, 2015. At that hearing, the Debtors agreed that if they were unable to sell the homestead property by the end of the redemption period,[7] the case would either be dismissed or converted. On April 27, 2015, they converted the case to one under chapter 7. Stip. Ex. No. 12, ECF No. 93. Having reconsidered their position, the Debtors filed the present motion.[8] ECF No. 107.

Both the Bank and the chapter 7 trustee oppose the motion. First, they argue, the Bankruptcy Code, under 11 U.S.C. § 706(a), does not allow for such relief. Second, they argue that even if the Court permits reconversion, the Debtors still have the duty to show they are acting in good faith and that any new plan of reorganization is feasible. And in that regard, both

---

[6] She identified the following items: replace a portion of the garage doors, replace screen doors, replace the threshold on doors, paint the garage, replace window screens, repair holes around the house, replace windows, replace floor boards, replace kitchen flooring, clean carpets, replace the plumbing in the sink and bathtubs, replace roof vents, replace carpet in the garage, redo the deck, and replace counter top ends.

[7] There was some confusion as to what the redemption date actually was. The Bank claimed it was May 26, 2015, based on Minnesota law that provides for a six-month period of redemption from the date of the foreclosure sale; that date was November 26, 2014. The Debtors, however, thought the date was June 26, 2015. In any event, that issue is now moot.

[8] Although the Debtors' motion was styled as "expedited," it was unclear as to why they characterized it as such. In any event, at the June 24, 2015 preliminary hearing, the matter was set over for an evidentiary hearing on September 30, 2015.

the trustee and the Bank assert that the Dahls have failed to do either.

## ISSUES PRESENTED

1. **Does 11 U.S.C. § 706(a) permit the Court to reconvert the Debtors' chapter 7 case to one under chapter 13?**

2. **If such reconversion is permitted, have the Debtors carried their burden?**

## DISCUSSION

As a threshold matter, the Court must determine if the Bankruptcy Code allows reconversion to chapter 13. Section 706(a) states in relevant part: "[t]he debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title." 11 U.S.C. § 706(a). Courts are split on this issue. Some courts have held that there is no discretion to allow reconversion to a chapter 13 case when it has previously been converted to one under chapter 7. See e.g., In re Fry, No. 04-16887, 2008 WL 4682266 at *2-3 (Bankr. D. Kan. Oct. 14, 2008); In re Muth, 378 B.R. 302, 302-04 (Bankr. D. Colo. 2007); In re Hardin, 301 B.R. 298 (Bankr. C.D. Ill. 2003); In re Banks, 252 B.R. 399, 402 (Bankr. E.D. Mich. 2000). Other courts have permitted reconversion, but only under appropriate circumstances. See, e.g., In re Povah, 455 B.R. 328, 341 (Bankr. D. Mass. 2011); In re Bange, No. 08-40156-7C, 2010 WL 3829632 at *1 (Bankr. D. Kan. Sept. 23, 2010); In re Johnson, 376 B.R. 763 (Bankr. D.N.M. 2007); In re Anderson, 354 B.R. 766, 768-69 (Bankr. D.S.C. 2006); In re Masterson, 141 B.R. 84 (Bankr. E.D. Pa. 1992); In re Hollar, 70 B.R. 337, 338 (Bankr. E.D. Tenn. 1987).

In Advanced Control Solutions, Inc. v. Justice, 639 F. 3d 838 (8th Cir. 2011), the Eighth Circuit addressed § 706(a), and upheld the bankruptcy court's order allowing the debtor to

reconvert back to chapter 13 after he previously had converted his original chapter 13 case to one under chapter 7. Id. at 840. In that case, though, the court had to contend with the "means test statute," § 707(b)(1) and (2). Id. Because the debtor in *Justice* was unable to rebut the presumption of abuse under § 707(b)(2), the bankruptcy court ordered him to convert the case to a chapter 13, or face dismissal of his case. Id. at 840-41. Thereafter, the debtor moved, and the court allowed him, to convert back to chapter 13. Id.

The case at bar, however, is different; it does not present any "interplay" between § 706(a) and § 707(b)(2). While *Justice* may stand for the general proposition that the Bankruptcy Code does not per se bar a debtor's reconversion to chapter 13, it really doesn't address other possible "appropriate circumstances" under which a debtor may reconvert to a chapter 13.

Perhaps the best analysis of this issue is that of Judge Joan Feeney in In re Povah.[9] She points out that "[c]ourts permitting reconversion have determined that '§ 706(a) is phrased as a restriction on the **debtor's** ability to convert a case . . . [and] . . . says nothing explicit about the **court's** authority to do so.' See In re Bange, 2010 WL 3829632 at *1 (emphasis supplied)." In re Povah, 455 B.R. at 340.

After examining the decisions on both sides of the issue, Judge Feeney sided with those courts that allowed reconversion:

> Based upon the decisions cited above, this Court adopts the reasoning of courts such as *Bange* and *Anderson* and concludes that it has discretion to permit reconversion of the Debtor's case to a case under Chapter 13 in appropriate circumstances. The debtor's circumstances, however, must be closely scrutinized, see Anderson, 354 B.R. at 769, and the debtor must establish both good faith and the feasibility of any plan of reorganization.

---

[9] 455 B.R. 328 (Bankr. D. Mass. 2011).

Id. at 341.

In *Povah*, Judge Feeney ultimately denied the debtor's motion to reconvert finding that "although the Debtor may be entitled to Chapter 13 relief, her proposed plan, which has not been reduced to writing, is devoid of substance." Id. at 342. Thus, while the bankruptcy court may utilize its discretion in deciding whether a reconversion to chapter 13 is appropriate, it is "the debtor [that] bears the ultimate burden of proof. In re Manouchehri, 320 B.R. 880, 884 (Bankr. N.D. Ohio 2004)." Id. at 341.

This Court agrees with Judge Feeney's well-reasoned analysis. The bankruptcy court has the discretion to allow reconversion to chapter 13 despite the seeming prohibition against it under § 706(a). But the question then becomes: "Have the Dahls met their burden of proof to show that this motion is being advanced in good faith and is the proposed plan feasible?" For the reasons below, this Court finds that their proposed chapter 13 plan is not feasible.

Many of the underlying facts in this case are undisputed.[10] Roger and Geraldine Dahl are married. Mr. Dahl, age 65, is retired from the United States Postal Service, having been a rural mail carrier. His pension from his government service is $1,300.00; he also draws a monthly social security check of $1,176.80. The family also receives certain non-monetary benefits from Roger's two nephews who operate a joint farming operation nearby.[11] Geraldine works between 16 and 20 hours a week, at the rate of $10.45 per hour, at the Wal-Mart store located in

---

[10] See ECF No. 122, "Stipulation for Evidentiary Hearing," which is hereby incorporated into these findings of fact and conclusions of law.

[11] Geraldine testified that Roger helps his nephews by "driving truck or tractor, and chasing cows." In return for these "part-time services" the family received a "full side of beef and sometimes the nephews would fill up the gas tank."

Crookston, Minnesota, a community located approximately 45 miles from her residence. She also testified that, on occasion, she serves as a "fill in" at the Wal-Mart store located in Grand Forks, North Dakota, which is another 22-23 miles further away. Geraldine is receiving a monthly payment of $222.00 based on social security disability. She testified that in November 2016, when she turns 62, she will be able to draw on Roger's social security account; her combined government benefits will then increase to $750.00 per month.

Geraldine also testified that over the last several months, to make ends meet, and to make necessary repairs to the Farmstead, she and Roger have had to resort to Roger's retirement account. She estimated that the amount withdrawn so far is about $20,000.00, and that there is about "$67,000.00 to $70,000.00 left." On cross-examination, she admitted that those withdrawals were subject to income tax, but that she did not know what their ultimate tax liability was going to be.

The Dahls also proposed a "new" chapter 13 plan,[12] one that they claim is confirmable, and that will allow them to pay off the debts owed to their two main creditors: the Bank and the priority claim of the IRS.[13] The plan provides for a monthly payment of $675.00 to the Bank for 13 months, which will increase to $750.00 for the next 31 months thereafter.[14] In month 59 of the plan, the debt owed to the Bank would balloon, and, according to Geraldine, would be paid

---

[12] See Stip. Ex. No. 7, also marked as Debtors' Ex. No. 12.

[13] See Stip. Ex. No. 16, proof of claim of the IRS in the amount of $22,054.76.

[14] The Bank would retain its first lien position and interest would continue to accrue at the rate of 6.75%.

through refinancing the amount due at that time ($32,125.45).[15]  The claim of the IRS would be paid in monthly installments of $175.00 for a period of 45 months.  The plan does not provide for the payment of any sum certain to the class of unsecured creditors; rather, the Debtors propose to continue to market the 40-acre parcel of land upon which Midwest Bank holds a mortgage lien of approximately $9,000.00.[16]  After deducting the closing costs, the net proceeds would go first to the remaining balance owed the IRS, and the balance pro rata to the unsecured creditors.

In support of their ability to fund their "new" plan, the Debtors submitted "Proposed Amended Schedules I and J."  See Stip. Ex. No. 14.  The Debtors listed all of their income from the various sources set forth above at $3,441.15.  Their monthly expenses total $2,800.69, leaving a monthly net income of $640.46 available to service the debt of the Bank and the IRS.

The Court views Geraldine's testimony as being very credible, especially because she candidly admitted that certain expenses were not included on their amended Schedule J,[17] to wit:

- Payments to Sioux Oil for utility service in the fall and winter;
- Voluntary contributions to their church ($20.00 when they attended);
- Annual renewal/registration fees for their two vehicles;
- Annual tax preparation fees (Geraldine testified that they paid $500.00 in 2014);

---

[15] Geraldine stated that refinancing would be obtained either through Midwest Bank or "[her attorney's] company," although she did not produce any concrete commitment in that regard.

[16] This is a separate parcel of land referred to by the Dahls as either the "hunting land" or the "recreational land."  According to Geraldine, this property had been listed for sale for $47,000.00, but had been reduced to $40,000.00.  She also testified that although there had been "some interest in it," no formal offers have been made.  Notably, the Debtors valued this parcel at $29,700.00.  See Schedule A.

[17] Geraldine also testified that the other family members who lived with them contributed to some of the household expenses, although no specific figures were mentioned.  On cross-examination, she admitted that these contributions were not reflected on either amended Schedule I or amended Schedule J.

- Fees paid for garbage and waste removal services;
- Fees for snow removal;
- Car repair and maintenance for their two vehicles;
- Real estate taxes; and
- Federal and state income taxes.

Geraldine was also asked about several checks that were written to "Stump's."[18] In response, she stated that this establishment was nearby and, for convenience, that they used the business as "their bank." She admitted that several hundred dollars paid for by check were not included in the amended Schedule J.[19] Geraldine also testified that no payments had been made to Midwest Bank on its debt; she stated that the bank would be paid when the real estate is sold. She testified that several bills remain unpaid; this testimony is supported by the stipulated facts. See ECF No. 122, ¶¶ 18, 19, 20, 21.[20]

When Geraldine was asked about whether the $300.00 allotted for transportation expense on her amended Schedule J would cover the extra miles put on for any additional hours she would work, she admitted that it would not. She also testified that she would be continuing to drive her daughter-in-law to Mayo Clinic, in Rochester, Minnesota, for medical treatments, at least once a month.

The stark reality that dooms the Debtors' proposed "new" plan can be found in their own

---

[18] A reference to Stump's Bar and Grill, located in Bejou, Minnesota. See Stip. Ex. No. 11.

[19] For example, at her Rule 2004 examination on September 11, 2015, Geraldine admitted to writing six checks to "Stump's" totaling $585.00. See Stip. Ex. No. 1, at 56-8, also marked as Bank's Ex. A; and Stip. Ex. No. 8.

[20] Geraldine took issue with the payment owed to the law firm referred to in ¶ 22 of the stipulated facts. She said that Roger had paid this bill at some point after the Rule 2004 examination.

bank records. From January 2015 through August 2015, the lowest amount incurred for expenses was $3,363.28. Here is the breakdown, by month:

- January: $7,672.40;
- February: $8,088.76;
- March: $6,680.70;
- April: $3,363.28;
- May: $6,576.63;
- June: $3,468.27;
- July: $5,432.47;
- August: $3,716.35.

See Stip. Ex. No. 1, at 1-52, also marked as Bank's Ex. A. Based on this spending history, it is difficult to fathom how the Dahls will be able to limit their monthly expenses to $2,800.69.

When asked about how she and her husband would deal with certain expenses that were not included in their projections, she replied that they would have to resort to Roger's retirement account. Of course, they have already "dipped into it" for approximately $20,000.00, for which they will be liable for state and federal income taxes. This Court cannot allow the Debtors, though well-intentioned, to reconvert to chapter 13. Their projected expenses are not based in reality.[21] When asked by the trustee why the Debtors converted their case to chapter 7, or why they now wanted to reconvert back to chapter 13, Geraldine couldn't articulate any reason(s).[22] It would simply be unconscionable for this Court to allow the Debtors to reconvert to chapter 13. Their proposed plan is simply not feasible. Their reliance upon the availability of Roger's retirement account to fund the plan is self-defeating. Simply put: a reconversion to chapter 13

---

[21] Although the focus of this analysis is on the feasibility of the Debtors' plan, a comment is in order about whether the Debtors bring this motion in good faith. Despite the protestations of the Bank and the trustee on such point, there is scant evidence in the record to show a lack of good faith on the part of the Dahls.

[22] In point of fact, Geraldine's response to both questions was "I don't know."

not only prejudices the creditor constituency, but it is also not in the best interests of the Dahls.[23]

## CONCLUSION

Based on the foregoing, this Court holds that a debtor may be allowed to reconvert a case from chapter 7 back to chapter 13 in appropriate circumstances; § 706(a) does not per se prohibit such reconversion. In such a case, however, the debtor must satisfy the court that the plan is proposed in good faith and that it is feasible. Here, the plan is simply not feasible.

**ACCORDINGLY, IT IS HEREBY ORDERED,**

1. The Debtors' request for expedited relief is **DENIED** as **MOOT**; and

2. The Debtors' motion to reconvert their case to chapter 13 is **DENIED**.

*/e/ Michael E. Ridgway*
Michael E. Ridgway
United States Bankruptcy Judge

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 01/08/2016
Lori Vosejpka, Clerk, by MJS

---

[23] In this regard, the analysis is analogous to the "presumption of undue hardship" concept embodied in 11 U.S.C. § 524(m)(1). It is worth mentioning that this Court had previously approved two reaffirmation agreements, both of which were presumed to be an undue hardship: a debt of $2,613.81 secured by the Debtors' 2007 Ford Taurus ($238.80 per month) (ECF Nos. 72, 77), and a debt of $13,754.57 secured by the Debtors' 2006 Buick Terraze and the Taurus ($368.33 per month) (ECF Nos. 73, 78). Notably, only the latter payment is listed on the Debtors' amended Schedule J (Stip. Ex. No. 14).